STATE of Missouri, Respondent,

v.

**Cleat D. CRIDER, Appellant.**

**No. SD 29687.**

Missouri Court of Appeals,
Southern District,
Division One.

March 23, 2010.

Motion for Rehearing or Transfer Denied April 14, 2010.

Application for Transfer Denied May 25, 2010.

Kent Denzel of Columbia, for Appellant.

Chris Koster, Atty. Gen., and Daniel N. McPherson, Asst. Atty. Gen., of Jefferson City, for Respondent.

ROBERT S. BARNEY, Judge.

Cleat D. Crider ("Appellant") appeals his conviction by the trial court for one count of the unclassified felony of statutory sodomy in the first degree, a violation of section 566.062.[1] Following a jury trial, Appellant was sentenced by the trial court to thirty years in the Missouri Department of Corrections. In his sole allegation of trial court error, Appellant maintains the trial court abused its discretion in refusing to allow Appellant to present evidence that G.S. ("Victim") had previously denied being abused without also finding that any such evidence would "open the door" for the State to present evidence of Appellant's alleged sexual abuse of Victim's sister, S.C. ("Sister"). We affirm the judgment and sentence of the trial court.

Viewing the evidence in the light most favorable to the jury's verdict, *State v. Tabor*, 219 S.W.3d 769, 771 (Mo.App.2007), the record reveals Appellant was married to A.C. ("Mother") and was Victim's stepfather. Appellant and Mother were married when Victim was two or three years old and Appellant was "the only father [she] knew...." Appellant and Mother then had two daughters, Sister and P.C., as well as one son, J.C. Appellant and Mother were divorced at the time of trial.

On May 1, 2005, T.D. ("Friend"), who was fourteen years old at the time, reported to her parents that she saw Appellant sexually abusing Victim when she was at their home visiting P.C. Her parents took her to the police station and she made a statement about the incident she had witnessed a few months prior. Friend testified at trial that on one particular afternoon she entered Appellant's home to visit P.C. and she decided to wander through the home when she discovered P.C. was not in her room. She was entering the kitchen when she saw Victim standing in front of the refrigerator. She related Appellant was kneeling down facing Victim with his back to Friend and his hand was in Victim's pants "moving up and down." She related Victim was looking at Appellant while chewing her fingernails and she heard Appellant remark to Victim "how does that feel? Does that feel good? Something like that." Victim then spotted Friend and stared at her without saying anything. Appellant then felt Friend's presence, removed his hand from Victim's pants, and approached Friend while Victim went out the kitchen door. Friend stated Appellant asked her, "Hey, how are you doing?" and she did not reply. Friend then left the house. A few weeks later she spoke with Victim about the incident and Victim told Friend she did not want to tell anyone about what had occurred. Friend ultimately told P.C. about the incident and they told both Mother and Friend's parents about the occurrence.

---

1. Appellant was also charged with three additional counts of the unclassified felony of statutory sodomy as well as one count of the unclassified felony of statutory rape in the first degree, a violation of section 566.032. These charges were dismissed by the State. Unless otherwise stated, all statutory references are to RSMo 2000.

Following Friend's statement to police, Appellant was arrested and he chose to waive his *Miranda*[2] rights. During his interview at the police station, he informed the officers that Friend observed him and Victim playing a game of "wedgie," which had been started by Victim, and he was grabbing her underwear to pull it up.[3]

Prior to trial, Appellant filed a "Motion to Use Alleged Victim's [Division of Family Services ("DFS")] Statement" during trial.[4] This motion was taken up by the trial court at a pretrial conference on January 9, 2009. At this hearing, the State maintained that if Victim's statement to DFS were introduced at trial then the State should be permitted to introduce evidence of other uncharged acts, namely Sister's allegations against Appellant, in order to explain Victim's statement to the DFS investigator. The State argued that admitting Victim's statement to DFS would "open the door" to evidence relating to Sister's allegations against Appellant, because the State would then need to elicit testimony from Victim that the reason she denied any abuse was because Sister was removed from the home following her disclosure of abuse and Victim did not want the same thing to happen to her. Defense counsel countered that the evidence relating to Sister had to be limited by the trial court due to the fact that Sister's claims were ultimately found by DFS to have been unsubstantiated and it would be prejudicial to Appellant to turn the current case into one involving Sister's claims. Defense counsel agreed the State could ask Victim "why she lied to DFS workers," but if she were allowed to discuss "the circumstances of why [she] lied" then that would "get into propensity . . . evidence of [Appellant], which is an uncharged bad act." On January 21, 2009, the trial court issued its "Order" overruling Appellant's motion.

A trial was held on January 21, 2009. At trial, Victim, who was seventeen years old at the time, testified that in December of 2004, when she was twelve years old, she was alone with Appellant in the kitchen of her home when Appellant got down on his knees in front of her, put his hand into her pants, and rubbed his finger on her vagina. She related Friend appeared in the kitchen door while this was occurring and stood there "in shock with her mouth open." She stated "[o]nce [Appellant] saw that [her] eyes were staring at something . . . he turned around and saw [Friend]" and he "got up real fast." Victim then "went out the back door."

Over Appellant's objection, Victim further related that the incident in question was not the first time she had sexual contact with Appellant. She related that in the spring of 2004, there was a situation "involving what a boy tried to do with [her],"[5] and shortly after that Appellant approached her in a sexual manner for the first time. She related she and Appellant were wrestling on the floor "and [she] had

---

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. Both Friend and Victim testified at trial that Appellant was not giving Victim a "wedgie" during the incident at issue. As best we discern, a "wedgie" appears to be a prank where one grabs the underwear of another and pulls up on the garment.

4. Before the allegations at issue, Appellant was under investigation by DFS for the sexual abuse of Sister and in conjunction with that investigation Victim was interviewed by a DFS investigator. During this interview, which occurred on December 14, 2004, Victim told the investigator that she had never been sexually abused.

5. The police records relating to this incident with "a boy" reflect that the event occurred on April 23, 2004.

baggy shorts on. And [Appellant] stuck his finger in [her] vagina, and said [he was going to] show [her] the right way a boy should love [her] and not the wrong way." She also stated that on numerous occasions thereafter Appellant touched her breasts and forced her to perform oral sex on him. She further detailed an incident which occurred between her and Appellant at a local park where Appellant made her perform fellatio on him until he ejaculated on a park bench. She related that between approximately April of 2004 and May of 2005 Appellant "had some type of sexual contact ..." with her "[a]lmost every day," but, saliently, she never told anyone about it "[b]ecause [she] was scared that [she] was gonna get taken out of [her] home and not be with [her] mom anymore," and because Appellant told her he would kill Mother if she disclosed the abuse.

After the close of the State's case, defense counsel sought and was permitted to make an offer of proof relating to the evidence it would present. In the offer of proof, defense counsel elicited testimony from Paul Adair ("Mr. Adair"), formerly an investigator for DFS, who testified he interviewed Victim on December 14, 2004, in conjunction with his investigation of Sister's allegations of sexual abuse at the hands of Appellant. Mr. Adair related he did not specifically ask Victim if Appellant had abused her, but that Victim "said that no one has ever done anything to her in a sexual manner, and ... that she would tell a teacher or the police if anyone did...."

Following the offer of proof defense counsel argued that Mr. Adair's testimony was logically relevant to the matter at hand as it was directly related to Victim's credibility. The State reiterated that it had no objection to the trial court permitting Mr. Adair's testimony; however, it felt it would open the door for the State to bring in information about *Sister*'s allegations against Appellant, because it would be entitled to "have [Victim] explain why she lied." Namely, Victim would be able to testify that she lied to Mr. Adair because Sister was removed from the home following allegations of abuse by Appellant, and she did not want the same thing to happen to her.

The trial court determined that, "[w]ell, I will allow you to [present the testimony of Mr. Adair].... I think once [defense counsel] open[s] it and say[s], when did this happen and what happened and put[s] Mr. Adair on, *I'm gonna let* [the State] *continue*." (Emphasis added). Ultimately, Appellant's counsel made the strategic decision not to offer Mr. Adair's testimony to the jury. No evidence was introduced by Appellant. The jury found Appellant guilty beyond a reasonable doubt of the crime of statutory sodomy in the first degree and he was sentenced by the trial court as previously set out. This appeal followed.

■ In his sole point relied on, Appellant essentially asserts the trial court abused its discretion in "refusing to permit [Appellant] to present evidence that [Victim] denied that anyone had ever sexually abused her, without its opening the door to the State's introducing otherwise inadmissible propensity evidence...."

■ In our analysis of Appellant's sole point relied on, we note Appellant would have been within his rights to have offered the admissions of Victim made to Mr. Adair in an attempt to impeach or contradict her prior testimony on direct even without obtaining prior trial court approval.[6] § 491.070; *State v. Douglas*, 529 S.W.2d 162, 164 (Mo.App.1975) (citing 2

6. "Impeachment evidence challenges a wit- ness' credibility. Contradictory evidence, on

Wharton's Criminal Evidence, 13th ed., 455, p. 392, holding that "[a] party has the right to impeach the credibility of a witness whom he did not call, and he may do so by cross-examination or through another witness"). Furthermore, while not expressly so denominated, Appellant essentially sought a motion in limine to prohibit the State from delving further into the matter by way of rebuttal or explanatory testimony subsequent to the *proposed* testimony of Mr. Adair. Appellant sought to bind the trial court to a ruling on evidence ahead of time without expressly offering the testimony at trial. "We are left, then, with a request to convict a trial court of an error it did not commit, which we cannot do." *State v. Carter*, 104 S.W.3d 413, 416 (Mo.App.2003). The trial court ultimately made an advisory ruling that Appellant could, indeed, offer Mr. Adair's testimony and if he did so, then the trial court would permit the State to rebut that evidence. In other words, the trial court made an interlocutory ruling on Appellant's motion which had all the attributes of a motion in limine. However, it has long been held that " '[a] ruling in limine is interlocutory only and is subject to change during the course of trial. The motion in limine, in and of itself, presents nothing for appeal.' " *State v. Whitwell*, 215 S.W.3d 760, 761 (Mo.App.2007) (quoting *State v. Purlee*, 839 S.W.2d 584, 592 (Mo. banc 1992)) (emphasis omitted). Appellant's point presents nothing for appeal. Point denied.

The judgment and sentence of the trial court is affirmed.

BATES, P.J., and BURRELL, J., concur.

the other hand, challenges a witness' accuracy and ordinarily supplies additional facts."

*State v. Westcott*, 857 S.W.2d 393, 398 (Mo. App.1993).